Good morning, your honors. May it please the court. I'm Mark Forsberg. I'm here on behalf of Sierra Nevada SW and Nevada NW. I think that the foundational issue that should be addressed at the beginning of my argument is whether a transferable development right in Douglas County, Nevada is a property right. As you're familiar from reading the district court's decision, it did not recognize a TDR as an intrinsic and separate property right, but rather viewed it as some sort of tool to accomplish development or to get permission to build roads. However, a TDR is a property right. They are obtained by placing conservation easements on property in sending area. They have to be purchased from ranchers and farmers who own such lands. The TDRs are recorded, as all property rights are in the county. They exist perpetually, whether they are used or not for development, and they create a right that the TDR owner has to develop. So let's assume that you're correct, that they are a form of property right under State law. That's only one of many things that have to be so in order for you to prevail on any of your claims. So would you discuss the other elements that are required and why you are entitled to relief? Well, I think that probably what you're asking me is to address the substantive due process claim that we've made that the county has essentially defeated the right to the value of our TDRs by allowing another developer to proceed without obtaining them. And what we have in this case is a master plan and a number of county ordinances that require the use of TDRs for the development of property in sending area. My clients obtained literally millions of dollars worth of development rights in order to comply with the master plan and to follow the county ordinances. Then an adjacent property owner, exactly adjacent, also in receiving area, the same receiving area, was permitted to develop without obtaining any development rights. But didn't the appropriate ordinances have alternative methods for obtaining permission to develop property, and only one of those involves the TDRs? The only alternative to developing property in receiving area without TDRs is to amend the master plan to remove it from receiving area, and that's what happened in this case. And the county did that for the purpose, they amended the master plan for the purpose of obtaining the construction of a section of roadway from the developer, from the property owner in the receiving area. Isn't a municipality free to amend its ordinances and doesn't have to do, doesn't have to? It didn't amend its ordinances. Or to follow, to, to, to, you're not saying that the municipality violated any ordinance, are you? I'm not saying, I'm not saying that they violated the ordinances. So if they complied with an ordinance, then how does that get your, your client some remedy? My, my, my contention is, and I believe that the record shows, that they modified the master plan for improper purposes. They didn't make the findings that their own master plan required to amend it and to remove this property from receiving area. And by doing so, they completely wiped out any ordinance that, the applicability of any ordinance that had to do with TDRs. The reason the master plan was amended was not for planning purposes. It wasn't to. Well, it, it stated, among other things, that the appropriate purpose was to assist in the development of the building of the Muller Parkway. And, and there were benefits that were described. And I know your client disagrees that those benefits are good enough, but why is that an improper purpose? It's improper because it's a pretextual reason. Ordinarily. How, how do, how do we know that other than just your say-so? Well, there's evidence that was presented to the district court that the developer that's, that was the beneficiary, if you will, of the master plan amendment and the relief from the TDR requirement, which is a very expensive and onerous requirement, already was obligated to build the road. Moreover. But there were additional concessions extracted, were there not? Not any concessions that were different from the ones Sierra Nevada Southwest made. Sierra Nevada Southwest had to get TDRs. It also had to build extensive sections of Muller Parkway. It had to build numerous other roads. It had to signalize intersections. It had to construct all sorts of drainage and, and other kinds of infrastructure that any developer does. The only distinction between my client and Perry is that the county found some way for some reason to amend the master plan to relieve Perry of this obligation. What was the pretext? You say for some reason. I mean, what, what were they trying to do by doing this scheme? This case was dismissed on the pleadings. I don't know if there's an ill motive or a improper purpose, but it's not necessary to prove that for this claim to advance, because a substantive cause. Well, what's the purpose of saying it's pretextual, then? Well, because. It doesn't mean anything, does it? Whether it's pretextual or not. It's not one of the purposes set forth in the ordinance that's an acceptable purpose for amending a master plan. If this is the antithesis of the plan. You're talking about building the parkway is not an acceptable purpose? Correct. It's not permissible for the county to amend its master plan in exchange for something of value from a developer. Now, does that violate the ordinance? Well, I think it violates due process and it violates substantive due process. How does it violate due process? Well, let me ask you this. What is your client's interest, other than competitive advantage, in having somebody else's proposal turned down? I understand why you can say your client has an interest in the TDRs, but you have no direct interest in somebody else being refused. No, absolutely not. And we've never asserted that we did. What we're saying is that by doing this and benefiting an adjacent developer with relief from this very expensive requirement, that it's destroyed the values of TDRs that are owned. But that's your takings claim. That's not your substantive due process claim. I think they go together. Moreover, it's, I think, a violation of equal protection. It's not proper for one property owner who is really identically situated to the next one to be treated so substantially different with no justification for the different treatment. It's not proper to look at the result and say, ah, well, this was made for the purpose to obtain this infrastructure. Are you making a class of one claim? Is that your equal? Yes. But doesn't that require some specific discrimination against your client, rather than adding a benefit to somebody else? No, I don't think so. I think that it requires that the class of one claimant be intentionally treated differently from another one. But you're not really a class of one because the one developer got a benefit, but no other property owners did. You were one of the ones that didn't, but a whole lot of other people didn't get it either. So you're not really a class of one. The benefited party may be a class of one, but the people who didn't get the benefits were numerous, it seems to me. I understand that conceptually, in a certain way, it's the reverse of an ordinary class of one claim where someone was deprived, but equal. Well, are you aware of any other case in which there was a reverse class of one, where everybody was treated the same except one person got a benefit? I'm not aware of any such case. And yet. How is your claim, you know, different from, it seems like it's the ordinary situation in almost every zoning case where somebody gets a variance. I mean, you get an advantage over everybody else. But this isn't a variance. But it's the same kind of, it's the same principle at work. And if we want to analogize it to a variance, then we have to go to what we traditionally look at when we talk about variances, which is that there has to be some justification for it. There has to be a, the ones I'm familiar with, to get a variance, you have to be, the reason for the variance cannot be self-imposed. It has to be because of something that you can't control, that you're entitled to a variance, not just a mere hardship. So you claim that you're similarly situated to the party that got its, got this benefit. Did your client attempt to secure a development agreement under this section of the ordinance that allows such agreements?  It did not. Well, then why is it similarly situated to a party that did seek that development agreement? In other words, if both parties had sought the development agreement and you were denied and they were accepted for no good reason, then it would seem like you were denied the development agreement. I don't understand why you're similarly situated. Well, we were similarly situated before either one of us did anything. Sierra Nevada Southwest developed its property in compliance with the existing master plan, in compliance with the TDR ordinances, in compliance with the PB ordinances. But a development agreement is also a recognized method of perceiving. It's not a recognized method of getting a master plan amendment. The statute in Nevada does not contemplate that you can make a development agreement that allows you to trade something of value for a master plan amendment. It would be just like offering them a million dollars. They're not for sale. Master plan amendments have to be based on planning principles. Is there a need? What is the effect on adjacent property? And those kinds of things. Isn't there a remedy for that then in State court by just appealing the whole deal and going to a court and on some kind of a review of the administrative agency and say this has violated the master plan? Isn't that your remedy if that was the case? Well, there is a remedy, but these are also Federal constitutional violations that are cognizable in the Federal courts. I don't think. Are there any attempts to review this in like the Nevada courts? No. There was not. Did you want to save some rebuttal time? I would. Thank you. Thank you. I'll hear from the other counsel. May it please the Court. My name is Brent Colvett. I'm here on behalf of Douglas County. Obviously, our position is that the District Court got this case right and that there is no cognizable Federal claims under any of the theories espoused in the complaint. This Court has already asked several questions, which I think direct to the heart of the case as to whether or not there is any Federal claim that should remain in this case. The TDRs, by way of some explanation, are, in our view, not destroyed by any action taken by Douglas County in this case. The purpose of the TDRs is to allow a property owner who is in a, quote, receiving area to gain additional density to allow him to develop his property in a way that otherwise he could not. In order to do that, he has to go out in the marketplace and find a rancher or farmer or somebody, a major property owner, who has land which is designated by the county as being ideal for preservation of green belt, open space, that type of thing. I conceptualize this a little bit like buying carbon credits in a way, where you sort of trade economic value with somebody who has something you don't. In a sense, that would be the case. I'm not as familiar with the carbon credit program or what was proposed in that regard, but another area where a developer needs something that he doesn't have on his own property would be an issue like water rights. He needs water to develop his property. He has to go out and find those water rights from somebody who has them, so he purchases them. He then brings them to his property so that he can develop his property and add homes, add commercial space, whatever he needs that water for. It's the same kind of thing. He acquires through that process the means to develop his own property, and that value remains. In other words, his property values stay the same. He now has a piece that he can develop much more extensively, much more completely than he could have otherwise. I'm just curious. Is TDR system common throughout Nevada, or is it unique to Douglas County? It is not common. It's somewhat unique to Douglas County. There are other examples of it. TRPA, I believe, uses them to some degree at Lake Tahoe. It's a concept, and I have some history of this, because years and years and years ago I was the district attorney in Douglas County, and the concept was explored 30 years ago to try and come up with a way of preserving the unique character of Carson Valley. If you have ever been there, you will see that it is a very beautiful spot, kind of a surprise in the deserts of Nevada as people envision Nevada. It sits at the base of the Sierra Nevadas. It's green, open. For centuries, decades at least, it was an agricultural community that people discovered and wanted to build in because it's beautiful. So the purpose of the TDRs is to try and maintain a semblance, if you will,  and the idea is to try and give some incentive to farmers and ranchers who have the large parcels to maintain that green belt, allow it to be there for future generations, and at the same time allow them to have some economic resource in their property. In other words, don't force them to sell and change it from pasture into streets and houses, but allow those properties to remain and allow somebody else in a more ideal position, such as Sierra Nevada Southwest in this case. And part of the reason that Sierra Nevada Southwest is in the position it is is because of the location of its property. It's along this proposed Muller Parkway, which would be a bypass to a bottleneck otherwise on 395, a major north-south interstate highway or portion of a highway property. So from that standpoint, getting back to the initial point, we do not believe that they lost any value at all in the TDRs. They have them. They allow Sierra Nevada Southwest and Nevada Northwest to develop their property. They have value. They remain to have value, and nothing that the county did affected that. Kennedy, when you said doesn't affected that, you mean to say that they haven't diminished the value? Um. Even? I don't know whether they have or they haven't diminished value as on the marketplace. But as to them personally, they have them. They can now develop their property because that was a condition of the approval of their development. Does it matter for this case if the value on the market was diminished? I don't believe that it does, Your Honor. The takings claim portion of this case argues that there has been a total wipeout of the value of these TDRs because now you have a whole different process to go through that avoids the TDR requirement. Well, that's not true. The ordinance that requires TDRs is still on the books. In other properties and other circumstances, TDRs are still required. So whether economic situation has reduced the value of those TDRs or some other factor has reduced those TDRs, it's irrelevant in my view because they still have them. The purpose for which they were acquired by Sierra Nevada Southwest and Nevada Northwest still survives. They have the ability now to build their property and develop their property. Frankly, the economic downturn in the country and in development generally has probably affected values on TDRs and other things like water rights a whole lot more than anything the county did. But the point of the motion to dismiss was to say that there is no set of plausible facts that you can plead that would support any of the claims for relief that you've sought, including the takings claim. So in our view, it doesn't matter what the value is. They still have the ability to utilize them. They haven't been wiped out. They haven't been taken away from them. So there has been no takings in that sense. The substantive due process claim, I think the court, again, down below, got this right. There is no pleading in this case that suggests that they have any, and it ties in with the TDR argument that I've just been making, that they have been deprived of anything of substance in this case. The purpose of those TDRs is not to take them out on the open marketplace once you acquire them and use them and sell them and pass them around. It was to allow a developer to develop his property more intensely than he otherwise could. That purpose is still being served in this case. Equal protection, there was some comment about that. I believe the analysis of the district court was correct in that, too. Is this a class of one? I tend to view this as the reverse of a class of one. If you look at the pleadings as they're pled, basically Perry, the developer who got the agreement with the county in which is being the focus of this case, is the one, and all other developers who still have to comply with the ordinance are the rest. And there was a rational reason for all of this. So what caused them to give Perry this deal that nobody else gets? You know, I don't know that it's nobody else. That's another thing that hasn't been established in this case, but let's assume that it is only for him. The way that this one went down was that they're generally, Mr. Forsberg's correct, there's a master plan amendment proposed, there's a zone change map proposed, and then after you get those things in place, you come forward with a request for a development agreement or an agreement to develop your property under the new master plan. That process is not unique to him. It's on the books. It's a valid method of developing your property. The problem with that that the county had in the past was that once you give the master plan change and you give the zoning change, and you've received all these promises of what's going to happen if you give those approvals, there's nothing really left in place to enforce it. There is no agreement. In this case, the county saw an opportunity to gain some improvements that were necessary, that they believed were necessary to implement another part of their master plan, which is the general transportation plan, and that component of their master plan called for realignment of some roadways in the area, construction of new interchanges and intersections with 395, and to do a lot of things at that end of the Muller bypass that was proposed that could get done immediately and quickly. So timing was part of it. Mr. Perry offered to do that immediately, not wait until his development generated enough traffic or other things to warrant the improvements that they wanted. So they saw an opportunity there, and in order to kind of put the cart before the horse, if you will, they wanted something that enforced the promises that Mr. Perry was making, and that was this agreement. So they did the agreement first. They gave them an enforceable contract with him on the condition that it only applied if the other elements, the master plan and the zoning, came into place. So you had it in a situation where they had, if they gave him the master plan amendment and zone change request that he was after, they would have an agreement with him that made him perform as he said he was going to. There was nothing in that agreement. In fact, the words in the agreement are very specific. They did not, that agreement did not guarantee that he was going to get his master plan change or his amendment to the zoning maps. Those still had to stand on their own merits. They still had to go through a public hearing. They were presented at a public hearing as part of the ordinance process. Is there anything in the agreement with Perry that takes away the need for him to use TDRs on other portions of the property if they are to be developed? No, Your Honor. It only applied to the commercial zoning that he was seeking. And even in that case, if he did not perform within seven years of the date of the agreement, he had to come in with the TDRs just like everybody else. So it didn't wipe out the requirement that he get TDRs for the balance of his property, which is substantial, and it didn't wipe out the obligation to go forward with TDRs if he didn't perform as he said he would and build the interchanges and the roads and the various other things. Mr. Forsberg argues that there's evidence in this record that Perry had an obligation to go forward with that road anyway. That may or may not be. I don't know. It wasn't part of his pleadings. It was a declaration that was submitted after the fact during the process of pleading this case. I don't know that it's relevant to the issue before the Court on the motion to dismiss because it wasn't part of those pleadings. And so we'd object to it even being considered. But to the extent you would, the county was not part of any private agreement between Perry and somebody else. This agreement that the county entered into with Perry gave them the ability to go forward with what they desired for that end of Miller Parkway. They have separate issues, separate interests, which were being pursued. In other words, there was a rational basis. It wasn't arbitrary and capricious, as argued. There was a real reason given by the county for why they needed to go forward with this or thought they did. Now, you can think differently. You can think they shouldn't have, but that's not the issue. It's did the county, in its view, have a reason for doing what it did and was that a valid, rational reason. On the record and as pled in this case, the court below found that it was. And I think that was the proper finding in this case. There's nothing in the pleadings that suggests that there was an intent to maliciously harm Sierra Nevada Southwest or Nevada Northwest. In fact, it's the opposite. They weren't part of that equation. The equation simply was between the county and Perry. And Sierra Nevada Southwest and Nevada Northwest weren't even part of that discussion. That it affected them, yes. But as this Court's already stated, almost every zoning decision, every variance that's granted, every approval of a new project affects somebody else, and the courts have recognized that in the cases we cited, that that's not grounds for turning down the particular project because it has an adverse effect on the economy of some other developer. And that's really what this is all about. This is an attempt to keep competition out of the same area that Mr. Forsberg's clients are in, and that's not a constitutional violation. With that, Your Honor, I would submit it. Thank you, counsel. Mr. Forsberg, you have a little bit of rebuttal time. Thank you. Thank you very much. First of all, I think it's completely erroneous to speculate that the reason that Sierra Nevada Southwest is doing this is to keep out competition. That's absolutely untrue. Sierra Nevada Southwest has a property right, a PDR. Now the county itself is standing before you and telling you that you don't have to do that. You don't have to get TDRs to develop this property. All you have to do is do what Perry did, get a master plan amendment, cut a deal with the county to give them something they want, and you can wipe it out. I'd love to go back to my client and to Douglas County and apply for that. His point at the end that any time the county approves something, it has all kinds of effects, some good, some bad, on other landowners or other parties. Isn't that what happens? Any time a local government makes a decision, it affects it. So is that what this case is? No, it isn't. This is a case where the county created a kind of a property right called a TDR. It was not optional for Sierra Nevada Southwest to get them. We were never given the opportunity to not get them and to develop our property in any other way. If I could go back today, tomorrow, say, and ask for a master plan amendment, and the county, as it now argues, would approve a master plan to take this land, our land, out of a receiving area so Sierra Nevada Southwest didn't need TDRs, what would we do with the $5 million worth of TDRs that we have? Who else, based on this argument by the county, is ever going to do anything other than get a master plan amendment and never have to get a TDR? And the county commission recognized this when they engaged in this transaction. They recognized that they were breaking training on the TDRs. They recognized that they'd never done it before for anybody else. They asked questions, is this setting a new precedent? Because they recognized that it was not something they had ever done. And they said, yeah, we're willing to give that up. We don't care about the TDRs anymore. We want somebody to build this road. Thank you, counsel. We appreciate very much the arguments of both of you. They've been very helpful. The case is submitted, and we will stand adjourned. Okay. Thank you.
judges: Adelman, Tashima, Graber